FILED 15 JUL '26 09:31 USDC-ORE

Nicole A. Calaway
David J.W. Calaway
11663 Aruba Dr.
Pensacola, Florida 32506
(tel.) 541-639-9103
Plaintiffs in pro per

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

NICOLE A. CALAWAY and DAVID J.W. CALAWAY,

Plaintiffs,

v.

JENNIFER FORSTER, LPC individually and as *de facto* state actor; RACHEL WOODS, individually and in her official capacity; TYLER WAMPLER, individually and in his official capacity; MCKENNA HOOLE, individually and in an official capacity; LENA BOLLING, individually and in an official capacity; LIESL WENDT, in her official capacity as DIRECTOR OF THE OREGON DEPARTMENT OF HUMAN SERVICES, for prospective relief only; and DOES 1–20,

Defendants.

No. ___6:26-cv-01452-AA___

**COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF (42 U.S.C. § 1983)**

DEMAND FOR JURY TRIAL

## I.   INTRODUCTION

1.     This civil-rights action asks whether the government of the State of Oregon may seize a devoted mother's child – K.A.– and place permanent "founded" child-abuse findings against both the mother – Plaintiff Nicole Calaway – and against her husband – Plaintiff David J.W. Calaway – on a state registry, and condition the child's return on the family's willingness to "affirm" the child's self-declared "transgender" identity – all because Plaintiffs, a

16029

conservative Christian husband and wife, together declined to endorse a false and medically dangerous belief and instead sought to protect the child from it.

2. Is it lawful when the minor child's own counselor, Defendant Jennifer Forster, LPC, acted in concert with and at the direction of ODHS caseworker Rachel Woods, fabricating a false pretext for K.A.'s removal — reporting to the State's child-abuse hotline, at Woods's express recommendation, that Nicole had been "aggressive and angry," that K.A. "would no longer have [mental health] support" and had "no outside [mental health] support," and, in her discharge summary, that Nicole terminated counseling out of a "desire to manage [K.A.'s] mental health without counseling support" — statements that a consensual recording of the July 17, 2024 session shows to be false?

3. When a devoted mother and stepfather refuse to "affirm" mother's fifteen-year-old daughter in the belief that the girl is "really" a boy, and instead show her mainstream medical evidence (including the United Kingdom's Cass Review) and the accounts of people who have "detransitioned," does that refusal constitute "mental injury" or "emotional abuse" sufficient for the State to remove the child and brand the mother and stepfather child abusers?

4. Is it "mental injury" for Plaintiffs to insist that biological reality — that a girl is a girl — take precedence over a psychological belief to the contrary, when reality-based care is precisely what sound mental-health treatment requires?

5. May the State treat "affirming" parents and "non-affirming" parents differently under the child-welfare laws, prosecuting the latter for the content of their religious and political viewpoint while offering the former no scrutiny at all?

6. Under the accepted standards of evidence-based medicine, have the interventions promoted as "gender-affirming care" — social transition, puberty blockers, and cross-sex hormones — ever been proven safe or effective in the treatment of the purely psychological condition of "gender dysphoria"; and did these Defendants know, or should they have known, that these interventions are harmful?

7. Did Defendants take custody of Nicole's daughter, and adopt "affirmation" as the governing standard, knowing full well — but not caring — that placing a vulnerable, self-

harming teenager onto the "gender-affirming" pathway exposes her to sterilization, loss of sexual function, diminished mental function, and other irreversible harms, in what amounts to a form of involuntary human medical experimentation?

8.      Without any court order that Plaintiffs are aware of, ODHS caused K.A.'s school to deny Nicole access to her own daughter's educational records. This conduct, together with the removal, the "founded" findings, and the compelled-affirmation condition on reunification, violates the First and Fourteenth Amendments and forms the basis of the claims herein.

9.      Plaintiff Nicole Calaway ("Nicole" or "Mother") is the biological mother of the minor child K.A. (d.o.b. September 24, 2008). She is a Christian, and until July 18, 2024, she was the legal and physical custodian of her daughter. She has never physically harmed her child, never abandoned her, and never denied her medical or mental-health care. To the contrary, Nicole selected and paid for counseling, supported her daughter's prescribed medication, pursued pediatric care, and repeatedly sought to protect her daughter from harm.

10.    Plaintiff David Calaway ("David") is Nicole's husband and K.A.'s stepfather. Though David is not K.A.'s biological father, he helped raise her and has been steadfastly dedicated to her well-being; he and Nicole stand together as husband and wife, together in their Christian faith, and together in their evidence-based understanding that so-called "gender-affirming care" is harmful to children and has never been proven safe or effective.

11.    David has no legal parental status as to K.A., and he asserts no claim for the loss of her custody, society, companionship or familial association. David sues solely in his own right. Like Nicole, he was named by ODHS as a perpetrator in a "founded" child-abuse ("Mental Injury") disposition arising from the family's refusal to "affirm" K.A. as "transgender." His claims are for the violation of his own constitutional rights — procedural due process (the stigma-plus injury of a "founded" finding recorded against him on a child-abuse registry) and the First Amendment (the free exercise of his religion and freedom from compelled ideological speech).

12.    This action arises under 42 U.S.C. § 1983 for the violation of Plaintiffs' rights secured by the First and Fourteenth Amendments to the United States Constitution, together with a pendent state-law claim, and seeks damages, declaratory relief, and injunctive relief, including expungement of the "founded" findings.

13.    This action seeks only to vindicate Plaintiffs' own federal constitutional rights and to obtain damages and prospective relief for their violation. It is not a child-custody dispute and is not an appeal from, or a collateral attack on, any state-court custody or dependency order. Plaintiffs do not ask this Court to alter the custody of K.A., to review, reverse, or enjoin any state-court custody or dependency judgment, or to interfere with any state-law proceeding, past or present. Plaintiffs' claims are independent federal claims arising from Defendants' own unconstitutional conduct.

## II.    JURISDICTION AND VENUE

14.    **Subject-matter jurisdiction.** This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) and (4), which confer jurisdiction over civil-rights actions brought pursuant to 42 U.S.C. § 1983.

15.    **Declaratory relief.** This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

16.    **Supplemental jurisdiction.** This Court has supplemental jurisdiction over Nicole Calaway's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal claims.

17.    **Venue.** Venue properly lies in the District of Oregon under 28 U.S.C. § 1391(b) because all of the events and omissions giving rise to Plaintiffs' claims occurred in Deschutes County, Oregon, and because one or more Defendants reside in this District.

18.    **Divisional assignment.** Deschutes County lies within the Eugene Division of the District of Oregon, and this action is properly filed at the Wayne L. Morse United States Courthouse in Eugene, Oregon.

COMPLAINT

19.    **Capacities in which Defendants are sued; Eleventh Amendment**. The Eleventh Amendment bars suit in federal court against the State of Oregon and its agencies — including the Oregon Department of Human Services — for retrospective damages and for prospective relief alike, and a state agency is in any event not a "person" suable under 42 U.S.C. § 1983. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984); *Edelman v. Jordan*, 415 U.S. 651 (1974); *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989); *Quern v. Jordan*, 440 U.S. 332 (1979). Plaintiffs therefore do not name ODHS itself as a defendant. Instead, Plaintiffs sue (i) the individual state actors — Defendants Rachel Woods, Tyler Wampler, McKenna Hoole, Lena Bolling, and Does 1–20 — in their individual capacities for damages, because such officials are "persons" answerable in damages under § 1983, *Hafer v. Melo*, 502 U.S. 21 (1991); and (ii) the Director of ODHS (Liesl Wendt), together with the individual state Defendants in their official capacities, for prospective declaratory and injunctive relief only, under Ex parte Young, 209 U.S. 123 (1908). A State's violation of fundamental constitutional rights does not, by itself, waive or abrogate its Eleventh Amendment immunity; rather, the Constitution's guarantees are enforced against the State prospectively through Ex parte Young and against the offending officials personally, for damages, under § 1983. *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976). Defendant Jennifer Forster is a private party who enjoys no Eleventh Amendment immunity and is sued in her individual capacity and as *de facto* state actore under § 1983 as a willful participant in joint action, and a co-conspirator, with the state Defendants, as alleged below.

## III.    PARTIES

20.    **Plaintiff Nicole Calaway** is a resident of Pensacola Florida but all relevant times was a resident of Deschutes County, Oregon. She is the biological mother of K.A. and, until the removal complained of herein, was the child's legal and physical custodian. She is a conservative Christian.

21.    **Plaintiff David Calaway** is a resident of Pensacola Florida but all relevant times was a resident of Deschutes County, Oregon. He is Nicole's husband and K.A.'s stepfather. Though he is not K.A.'s biological father, David helped raise her and was dedicated to her

welfare, and he and Nicole share the same Christian faith and the same evidence-based understanding that "gender-affirming care" is harmful and unproven. He is not K.A.'s legal parent and had no legal custody of her. He is a conservative Christian. ODHS named David as a perpetrator in a "founded" Mental Injury disposition and recorded that determination, with the same stigmatizing and collateral consequences alleged below as to Nicole.

22.    **The minor child, K.A.,** is Nicole's daughter, born September 24, 2008. She was fifteen years old at the time of her removal on July 18, 2024, and is now seventeen. She is referred to by her initials to protect her privacy.

23.    **Defendant Jennifer Forster, LPC** is a licensed professional counselor doing business as Forster Counseling LLC, who counseled K.A. from December 2023 until July 17, 2024. Forster is a private counselor and is sued individually and also as a *de facto* state actor under 42 U.S.C. § 1983 because, as alleged below, she was a willful participant in joint action with, and conspired with, ODHS caseworker Defendant Rachel Woods and other state actors — including by making, at Woods's express recommendation, a child-abuse hotline report containing false statements that furnished the pretext for K.A.'s removal. A private party who willfully participates in joint action with state officials, or conspires with them, acts under color of state law. *Dennis v. Sparks*, 449 U.S. 24 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982). Forster is sued in her individual capacity for damages.

24.    **The Oregon Department of Human Services ("ODHS")** is the state agency responsible, through its Child Welfare program, for investigating allegations of child abuse and neglect, taking children into protective custody, making "founded" and "unfounded" dispositions, maintaining records of those dispositions, and providing child-welfare services in Deschutes County. Its officers and employees, including Defendants Woods, Wampler, Hoole, and Bolling, acted at all relevant times under color of state law. ODHS is an arm of the State of Oregon, is immune from suit in this Court under the Eleventh Amendment, and is not a "person" suable under 42 U.S.C. § 1983. Plaintiffs therefore do not name ODHS as a defendant. The prospective declaratory and injunctive relief Plaintiffs seek from the State is

directed instead to the Director of ODHS in her official capacity under *Ex parte Young*, 209 U.S. 123 (1908), as set forth below.

25.    **Defendant Liesl Wendt** is the Director of the Oregon Department of Human Services and its chief executive officer, and is responsible for the policies, practices, and records of its Child Welfare program, including the maintenance and expungement of "founded" child-abuse dispositions and the restoration of a fit parent's access to her child's records. Director Wendt is sued solely in her official capacity and solely for prospective declaratory and injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908); Plaintiffs seek no damages against her. Fariborz Pakseresht served as Director of ODHS during the events alleged in this Complaint and retired in the fall of 2025; Director Wendt was confirmed as his successor in November 2025. Under Federal Rule of Civil Procedure 25(d), the current holder of the office is the proper official-capacity defendant for the prospective relief Plaintiffs seek from the State.

26.    **Defendant Rachel Woods** is, and at all relevant times was, an ODHS Child Welfare caseworker who authored the July 19, 2024 Protective Custody Report, presented the allegations that led to the removal of K.A., and participated in the "founded" disposition against Plaintiffs. She is sued in her individual capacity for damages and in her official capacity for prospective relief.

27.    **Defendant McKenna Hoole** is, and at all relevant times was, an ODHS Child Welfare worker who, together with Defendant Woods, responded to the family and participated in the investigation of the allegations against Plaintiffs and in the events culminating in the removal of K.A., as reflected in the Protective Custody Report. Hoole is sued in an individual capacity for damages and in an official capacity for prospective relief.

28.    **Defendant Lena Bolling** is, and at all relevant times was, an ODHS Child Welfare worker who, together with Defendant Woods, participated in effecting the July 18, 2024 removal of K.A. — arriving with a Deschutes County deputy to serve the protective-custody order and transporting K.A. from Plaintiffs' home — as reflected in the Protective Custody

Report. Bolling is sued in an individual capacity for damages and in an official capacity for prospective relief.

29.    **Defendant Tyler Wampler** is, and at all relevant times was, an ODHS Child Welfare supervisor who reviewed, approved, and ratified the "founded" Mental Injury dispositions against Plaintiffs. He is sued in his individual capacity for damages and in his official capacity for prospective relief.

30.    **Defendants Does 1–20** are ODHS supervisors, attorneys, screeners, caseworkers, reviewers, and other state and county actors, whose true names and capacities are presently unknown to Plaintiffs, who participated in, directed, approved, or ratified the acts and omissions alleged herein, including the screening decisions, the protective-custody request, the "founded" disposition, and the January 29, 2025 review upholding it. Plaintiffs will amend to allege their true names when ascertained.

31.    **Agency and concert of action.** At all relevant times each Defendant acted under color of state law and within the course and scope of his or her employment or agency, and acted in concert with, and as the agent of, each other Defendant, such that each is responsible for the acts and omissions of the others.

## IV.    FACTUAL ALLEGATIONS

### A.    Plaintiffs' family and her daughter's long-standing mental-health history.

32.    Nicole is the mother of two daughters, whom she and her husband David have raised together. Both girls were, by all accounts, bright and artistic. Beginning around 2018, Nicole and David noticed both daughters becoming increasingly withdrawn and secluded, and — acting together as any conscientious parents would — promptly enrolled them in professional counseling.

33.    K.A.'s mental-health difficulties are long-standing and multi-causal, and they long predate any of the conduct ODHS later labeled "abuse." Provider records reflect that K.A. reported anxiety as early as April 2021; engaged in self-harm (including with medical

scissors) by July 2021; reported suicidal ideation by June 2022; and, over 2022–2023, attended near-weekly appointments carrying diagnoses that included Tourette's, chronic PTSD, anxiety with panic, and mood and depressive disorders, for which she was prescribed medication.

34. These difficulties coincided with numerous stressors unrelated to Plaintiffs, including ongoing conflict with the girls' biological father, the disruptions of the COVID-19 period, the loss of friendships, peer and online influences, and the comorbid psychiatric conditions listed above.

35. Throughout, Plaintiffs were engaged and protective parents. They obtained counseling, supported medication, paid for private counseling out of their own pockets, and cooperated with K.A.'s pediatric providers.

**B.** **Two prior referrals were closed — one "unfounded," one at screening — and two immediate-danger motions were denied.**

36. In February 2023, ODHS received a first referral concerning the family. That referral was CLOSED AT SCREENING.

37. In October 2023, ODHS received a second referral alleging that Nicole and David lectured K.A. and called her names. Following an assessment, that referral was CLOSED AS UNFOUNDED for mental injury. A supervisor approved the unfounded disposition on or about December 29, 2023.

38. In January 2024, the child's biological father, Keith Allison — a custody adversary of Nicole — filed a motion for immediate danger. It was DENIED. On or about June 17, 2024, Mr. Allison filed a second immediate-danger motion. It, too, was DENIED on June 18, 2024.

39. Thus, on essentially the same facts later used to remove K.A., a neutral court had twice declined to find immediate danger, and ODHS had already once found the mental-injury allegation UNFOUNDED.

COMPLAINT

**C.    K.A. received attentive medical and mental-health care with Plaintiffs' active support.**

40.    On May 22, 2024, K.A. began care with a primary-care physician (PCP), Amanda Bryson, at St. Charles Family Medicine. The PCP — a neutral provider — observed an involved and appropriate parent, reported no abuse concerns, and noted an improving mother–daughter dynamic.

41.    On May 30, 2024, K.A. was started on Prozac (10 mg), which Nicole and David supported. At a July 15, 2024 follow-up, the dose was increased to 20 mg and K.A. reported reduced suicidal ideation — improvement that occurred while she was in Plaintiffs' care and with their support.

42.    Nicole, together with David, selected and paid for a licensed professional counselor, Jennifer Forster, LPC, of Forster Counseling LLC, beginning in December 2023, for weekly sessions. The counselor reduced her fee to accommodate the family. At no time did that counselor report any physical abuse.

**D.    Plaintiffs' refusal to "affirm" was grounded in their shared religious conviction and in medical reality.**

43.    Nicole and David are conservative Christians, united in their faith. Under their sincerely held religious beliefs, the body is not to be disfigured. Under biological and medical reality, a person cannot change from one sex to the other. A boy is a boy, and a girl is a girl.

44.    Nicole and David's refusal to "affirm" K.A. as "transgender" rested on two independent grounds they held in common. First, their shared religious convictions. Second, and equally important, their shared knowledge — informed by mainstream medical evidence — that so-called "gender-affirming care" – including "social transition" – is harmful to children and teens and has never been proven safe or effective for treating gender dysphoria.

45.    Consistent with these shared convictions, Nicole engaged her daughter with facts and evidence. She showed her daughter recordings of public school-board meetings, material from the Cass Review, and the account of a person who had "detransitioned." This is core protected

10
COMPLAINT

activity: religious exercise, parental direction of a child's upbringing, and speech on a matter of intense public concern.

46.    Plaintiffs' restrictions on K.A. — removing a cell phone and social media, obtaining a landline, and monitoring for means of self-harm — were safety-based and mirrored provider-recommended safety planning. On information and belief, a peer had instructed K.A. where to cut herself so that her parents would not see, and there was a serious risk of online grooming.

**E.    The May 23, 2024 school incident — and K.A.'s recantation.**

47.    On May 23, 2024, K.A. left school with a friend and the friend's father without notifying Nicole, telling school staff she did not feel safe at home because, the night before, her mother had shown her videos about the transgender issue — including school-board footage, the Cass Review, and a detransitioner's account. A school resource officer directed that K.A. be taken to a stabilization center. ODHS visited the home. On information and belief, the ODHS workers who responded in connection with the family that day included Defendants Rachel Woods and Hoole, who conferred with the responding Bend Police officers and a Community Crisis Response Team worker regarding K.A. and thereafter attempted to "safety plan" with Plaintiffs.

48.    On information and belief, K.A. had been in contact with her biological father during the school day, and Nicole reasonably believes her daughter was being influenced by the biological father, by school personnel, and by others on what to say. After returning home that day, K.A. told Nicole she was "so sorry for lying to everyone," and in the days that followed she repeatedly thanked her mother for helping her "acknowledge reality."

49.    In the weeks that followed, the family functioned well: hiking, kayaking, church attendance, time with friends, and planning for K.A.'s enrollment in a private Christian school (Trinity Lutheran), which Nicole and David toured on June 4, 2024.

**F.    The July 17, 2024 counseling call, the counselor's false reports to ODHS, and the July 18, 2024 removal.**

50.    On July 17, 2024, with K.A.'s knowledge, Nicole arranged a speaker-phone session with K.A.'s counselor, Defendant Jennifer Forster, and recorded it with the knowledge and consent of the participants; the recording preserves the entire conversation. During that call, K.A. herself pressed Forster to explain why she would not help K.A. "live in reality," and told Forster that she had "woken up" to the "truth" about what she called the transgender "cult" and no longer wanted Forster's services. Forster grew defensive, responded that parents should not be involved in their daughter's therapy, and refused to answer Nicole's questions.

51.    Contrary to what Forster would soon report to the State, Nicole remained calm and civil throughout the call. Forster herself repeatedly acknowledged Nicole's right to K.A.'s records ("you absolutely have a right to get copies of the records"; "Legally, yes, you can have access to her records"). Neither Nicole nor K.A. suggested that K.A. would be left without mental-health care — K.A. remained under the care of her primary-care physician and on prescribed medication. Both made clear only that they wished to discontinue this particular counselor after Forster would not speak candidly in front of K.A.'s mother, K.A. telling Forster, "if things are going to be hidden from mom … we should stop the counseling sessions." Nicole ended the relationship because of that breach of trust, not to isolate her daughter.

52.    Immediately after the session, at 4:29 p.m. that same day, Forster telephoned Defendant Rachel Woods, the ODHS caseworker, to report the termination. By Forster's own contemporaneous record, Woods told her that ODHS had already "found grounds for mom and step-dad's mental abuse of client," i.e. that Plaintiffs did not "affirm" K.A.'s "transgender" identity. Woods then "recommended that [Forster] call the CPS hotline."

53.    At Woods's urging, on the morning of July 18, 2024, Forster made a report to the State's child-abuse hotline (Case No. 3768259). In that report and her related records, Forster made statements she knew to be, or recklessly disregarded as, false: (a) that Nicole had

"presented as aggressive and angry during [the] phone call"; (b) that K.A. "would no longer have support" and had "no outside support"; and (c), in her July 21, 2024 discharge summary, that Nicole terminated counseling out of a "desire to manage client's mental health without counseling support."

54.    Each of Forster's statements is false and squarely refuted by the recording of the speaker phone call. Nicole was even-tempered and professional, not "angry" and not "aggressive." K.A. and Nicole together terminated Forster, but at no time did Nicole state, suggest or imply that K.A. would be without professional mental health support.

55.    Forster's falsehoods supplied ODHS with a fabricated appearance of urgency — a vulnerable child abruptly stripped of all mental health "support" by an "aggressive and angry" mother.

56.    The very next day, July 18, 2024, while the family was together at a baseball game, an officer contacted the household and directed the family to return home immediately. Upon their return, ODHS and law-enforcement officers removed K.A. from Plaintiffs' home. On information and belief, the ODHS workers who effected the removal included Defendants Rachel Woods and Bolling, who arrived with a Deschutes County Sheriff's deputy to serve the Protective Custody Order — signed that day by a state Circuit Court judge — and transported K.A. from the home. K.A. was placed with her biological father, Keith Allison, the same custody adversary whose two immediate-danger motions the court had already denied, and who is "more supportive" of the child's claimed transition.

57.    Forster did not act as an independent reporter. She made her hotline report at the express recommendation of ODHS's own caseworker, in aid of ODHS's pre-existing plan to remove K.A., and while separately communicating with K.A.'s biological father, Keith Allison, to whom she relayed information about the child. In so doing, Forster willfully participated in joint action, and conspired, with state actors to bring about K.A.'s seizure. On July 19, 2024, Defendant Woods filed a Protective Custody Report ("PCR"), which recounts the participation of Defendant Hoole and other ODHS workers in the investigation; the PCR is the agency's one-sided narrative of allegations, not adjudicated findings.

58.    As a licensed mental-health professional, Forster knew, or in the exercise of reasonable professional care should have known, that so-called "gender-affirming care" — including social transition — is not an established, safe, or effective treatment for an adolescent girl and carries a serious risk of lasting psychological and physical harm. A competent counselor in her position would not have set in motion K.A.'s removal from the one home that was protecting her from that pathway, nor made false reports that helped place her on it.

G.    The Protective Custody Order was procured through a one-sided presentation that omitted material exculpatory facts.

59.    On information and belief, in obtaining the Protective Custody Order and in the PCR, Defendants presented a one-sided narrative and omitted material exculpatory facts that any reasonable factfinder would have wanted to know, including: (a) that the October 2023 mental-injury allegation had already been found UNFOUNDED; (b) that the biological father's two immediate-danger motions had both been DENIED; (c) that the neutral PCP observed an involved parent, an improving mother–daughter dynamic, and no abuse; (d) that K.A.'s suicidal ideation had reduced on medication that Plaintiffs supported; (e) that K.A. had recanted her school-day statements and thanked her mother; and (f) that the agency's own record attributed the specific verbal conduct inconsistently, leaving the "founded" findings resting on a confused and internally contradictory factual basis.

60.    The PCR expressly grounds the request for custody in the parents' viewpoint and religiously motivated conduct — including "hours of videos on why being transgender is wrong," the parents' belief that "men are men and women are women," and their refusal to "affirm" or to permit transition — rather than in any physical danger. The agency's own "efforts to avoid custody" consisted largely of offering LGBTQ-oriented handouts that the parents declined, which is itself viewpoint-laden.

61.    Had Defendants disclosed the omitted exculpatory facts, there would have been no reasonable basis to believe K.A. faced imminent danger of serious harm from Plaintiffs, and no order removing her would have issued.

14
COMPLAINT

**H.    The "Founded" finding and the stigmatizing registry.**

62.    On or about August 28, 2024, ODHS completed its CPS assessment. On or about September 13, 2024, ODHS issued a "Founded" disposition for "Mental Injury" against Plaintiff Nicole Calaway.

63.    The September 13, 2024 founded-disposition notice, signed by Defendant Rachel Woods, stated the agency's basis for the finding in its own words: that Nicole was responsible for K.A.'s "Mental Injury" because her "adverse reactions to [K.A.] expressing [her] gender identity have caused serious harm to [K.A.'s] psychological functioning." The finding thus rested expressly on Nicole's response to the gender-identity issue, and not on any physical harm, neglect, or other cognizable abuse.

64.    On or about May 12, 2025, following its internal review process, ODHS's Central Office issued a final agency order affirming the founded "Mental Injury" disposition against Nicole. The order asserted "reasonable cause to believe that Nicole Calaway is responsible for the Mental Injury to Kaitlyn Allison," stated that Nicole had "terrorized and isolated" the child, warned that the finding "could have an impact on [her] ability to obtain or retain a professional license or certain type of employment," and recited that any further review lay in state Circuit Court under ORS 183.484. The order left ODHS's founded designation against Nicole final within the agency.

65.    Arising from the same course of conduct and the same refusal to "affirm," ODHS issued a parallel "Founded" Mental Injury disposition naming David as a perpetrator, and recorded that determination with the same registry and collateral consequences described below. By a Notice of Local Child Welfare Office Decision dated October 22, 2024, ODHS advised David that it had found "reasonable cause to believe that David Calaway is responsible for the Mental Injury of Kaitlyn Allison," and stated the basis for the finding in the agency's own words: "You refuse to support Kaitlyn's gender identity and instead have provided hours long lectures that have led to Kaitlyn experiencing panic attacks and suicidal

ideation. In addition, you have made harmful statements regarding [self-]harming behaviors. You have also refused Kaitlyn mental health support when contrary to your personal beliefs."

66.    On or about January 3, 2025, ODHS's Central Office issued a final agency order affirming the founded Mental Injury disposition against David, asserting that he had "spurned, terrorized, and isolated" K.A. As with the order against Nicole, it warned of consequences for David's ability to "obtain or retain a professional license or certain type of employment" and identified state Circuit Court review under ORS 183.484 as the only remaining avenue.

67.    The stated premise of these findings—that Plaintiffs' "lectures" about the "transgender" issue caused K.A.'s "panic attacks and suicidal ideation"—is contradicted by K.A.'s own provider records. As alleged above, K.A. reported anxiety as early as April 2021, engaged in self-harm by July 2021, and reported suicidal ideation by June 2022, carrying diagnoses that included chronic PTSD, anxiety with panic, and mood and depressive disorders—all well before any question of "gender identity" arose in the family, and well before the conduct ODHS later labeled "abuse." The founded findings recast K.A.'s pre-existing, multi-causal psychiatric conditions as the product of Plaintiffs' protected religious and expressive conduct.

68.    A "founded" child-abuse disposition is recorded by the agency and brands each of them a child abuser. It carries concrete, lasting consequences for each — including its effect on any employment, licensure, or volunteer activity that requires a child-abuse records check — wholly apart from the removal itself.

69.    On or about January 29, 2025, a local ODHS office review UPHELD the founded finding, leaving Central Office Review as the next step. On information and belief, the review process afforded Plaintiffs no meaningful, neutral opportunity to confront and rebut the one-sided allegations before the stigmatizing designations attached and were maintained.

70.    Since the July 18, 2024 removal, Nicole has been almost entirely cut off from her daughter. On information and belief, Defendants have taken the position that Nicole may have no contact with K.A. unless K.A. initiates it, and that Nicole may not access her daughter's

school, medical, or other records — an extraordinary severance of the parent–child relationship imposed without any adjudication that Nicole abused her child.

**I.** **The State dismissed its own dependency petition, yet the founded findings remained.**

71. On November 22, 2024, on ODHS's own oral motion, the Circuit Court of the State of Oregon for Deschutes County (the Honorable Bethany P. Flint) entered a Judgment Dismissing Dependency Petition in *In the Matter of K.A.*, No. 24JU03667, finding that it was "in the best interest of the child to dismiss temporary custody of the child to ODHS and the dependency petition in this matter," and ordering that both the temporary custody to ODHS and the dependency petition were "DISMISSED." The State thus abandoned the very dependency proceeding through which it had removed K.A. from Plaintiffs, roughly four months after the July 18, 2024 seizure.

72. Notwithstanding the dismissal of its own dependency case, ODHS neither withdrew nor reconsidered the stigmatizing founded child-abuse findings against Plaintiffs. To the contrary, the agency's Central Office affirmed those findings months later—as to David on January 3, 2025, and as to Nicole on May 12, 2025—the findings remained recorded against both Plaintiffs, and K.A. was not returned to Nicole's custody. The dismissal confirms that no ongoing threat of serious harm justified the removal, the founded findings, or the continued severance of the mother–daughter relationship.

**J.** **ODHS's second, escalated "Founded" finding against David—a "Threat of Harm" premised on an uncorroborated accusation of "grooming."**

73. More than a year after the dependency case was dismissed, and after Plaintiffs had relocated to Florida, ODHS opened and completed a new CPS assessment against David alone—"completed 12/19/2025"—on an entirely different and far graver theory. By a Notice of Child Protective Services Founded Disposition dated December 22, 2025, which David received on or about May 12, 2026, ODHS notified David that it had found him responsible for a "Threat of Harm" to K.A., stating: "The information gathered supports that you have a

history of grooming and sexually abusing a minor, and despite this previous behavior and no attempts to mitigate it, you gained access to Kaitlyn. Your history placed Kaitlyn at risk of severe harm."

74. By a Notice of Local Child Welfare Office Review Decision dated June 5, 2026, ODHS affirmed the "Threat of Harm" disposition, restating that David had exhibited "a pattern of inappropriate grooming behaviors to include making inappropriate sexual comments while Kaitlyn was in his care that was likely to result in severe negative impacts to [K.A.'s] well-being."

75. This second finding is false and unsupported. David has no history of grooming or sexually abusing any minor; no such conduct ever occurred; and the accusation is uncorroborated by any charge, conviction, adjudication, or competent evidence. Issued only after Plaintiffs had left Oregon and begun to seek vindication of their rights, the finding escalated the stigma imposed on David—from a "Mental Injury" arising out of the family's refusal to "affirm" to a fabricated brand of child sexual predator—a designation of the gravest kind, carrying severe and lasting consequences for David's reputation, employment, professional licensure, and ability to volunteer, wholly apart from the earlier Mental-Injury finding.

**K.    ODHS blocked Plaintiffs' access to K.A.'s educational records without any court order.**

76. Nicole also sought to view K.A.'s educational records at Mountainside High School in Beaverton, Oregon, through the online ParentVue portal. By email dated September 23, 2024, the school counselor, Andrew Witt, informed Nicole that, "in order to comply with Oregon DHS instructions, we are not able [to] provide you with access to ParentVue at this time."

77. The school's denial of access was expressly and admittedly compelled by ODHS. On September 30, 2024, the Beaverton School District registrar, Debbie Kuroiwa, confirmed in writing: "Per DHS orders: Mom is to have academic information only. Mom does not have ParentVue access," explaining that "it has been communicated to us that [the] father['s] and

student['s] address should be confidential," and that "We are complying with DHS and to do so we cannot give her access at this time." The ODHS caseworker who conveyed and enforced these instructions was Jennifer Anderson, an ODHS Child Welfare permanency worker and one of the Doe Defendants, who relayed the district's confirmation that Nicole's electronic access to her own daughter's records was being withheld on ODHS's instruction.

78.    ODHS's directive was not fleeting. As late as June 18, 2026—nearly two years later—the district continued to withhold ParentVue access from Nicole, asking her to supply "documentation from DHS indicating that we can grant you ParentVue access." The denial of Nicole's access to her own child's educational records thus rested entirely on ODHS's extrajudicial instruction, was imposed and maintained without any court order, and remains ongoing.

79.    Through this conduct, ODHS — acting without any court order — denied Nicole, a fit parent who had not been adjudicated to have abused her child, access to K.A.'s educational records to which a parent is constitutionally and statutorily entitled, and caused the child's school to withhold them. No legitimate child-safety interest justified it.

L.    **"Gender-affirming care" is experimental and harmful, and has never been proven safe or effective.**

80.    "Gender dysphoria" is a psychological condition catalogued in the DSM-5. It refers to distress arising from a felt incongruence between a person's "gender identity" and biological sex. It is, at bottom, a condition of the mind, not the body.

81.    The interventions marketed as "gender-affirming care" for minors — social transition, puberty blockers, and cross-sex hormones — have never been proven, under the accepted standards of evidence-based medicine, to be effective in treating gender dysphoria. The evidence base is of very low certainty.

82.    These interventions are, by contrast, affirmatively harmful. Puberty blockers arrest normal adolescent development and, in the pathway that typically follows, contribute to loss of fertility and impaired sexual function. Moreover, preventing normal development causes a

permanent impairment in brain development. Cross-sex hormones compound the harm: for a female such as K.A., the administration of testosterone causes sterility, is associated with serious health risks including an increased risk of liver disease and cancer, and produces irreversible changes to the body. "Gender-affirming care" is not safe and effective; it is unsafe and ineffective.

83.    Social "transition" itself is not a neutral act. On information and belief, affirming a child in a false belief that she is the opposite sex is harmful in itself and materially increases the likelihood that the child will proceed to puberty blockers and cross-sex hormones, thereby compounding the injury.

84.    **The Cass Review.** In April 2024, the United Kingdom's National Health Service published the final report of the Independent Review of Gender Identity Services for Children and Young People, led by Dr. Hilary Cass (the "Cass Review"). After commissioning systematic reviews of the evidence, the Cass Review found the evidence for puberty blockers and cross-sex hormones in minors to be "remarkably weak," and it cautioned against the "affirmative" model. England's NHS thereafter restricted the routine use of puberty blockers for gender dysphoria in minors. Sweden and Finland had already sharply curtailed these interventions after their own evidence reviews.

85.    **The 2025 HHS Review.** In 2025, the United States Department of Health and Human Services issued its report, "Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices," which confirmed that the use of puberty blockers and cross-sex hormones in minors is not supported by sound evidence of efficacy and carries serious risks of harm. Plaintiffs presented, or are prepared to present, this and comparable evidence, which Defendants ignored.

M.    **WPATH and the fraudulent "standards of care."**

86.    The medical use of puberty blockers and cross-sex hormones on children and teens is promoted principally through the "Standards of Care" published by the World Professional

Association for Transgender Health ("WPATH"). Defendants' "affirmation" standard traces to the WPATH model.

87.    Plaintiffs allege that WPATH's "Standards of Care" are not the product of rigorous, independent, evidence-based medicine but of ideological advocacy, and that WPATH is, in this respect, a fraudulent organization. On information and belief, WPATH commissioned systematic evidence reviews and then suppressed or restricted their publication when the results did not support its recommendations; permitted its recommendations, including the removal of minimum-age criteria, to be shaped by political and legal considerations rather than science; and has held out its "Standards of Care" as authoritative while concealing the weakness of the underlying evidence. These matters were exposed, among other places, in the 2024 disclosures known as the "WPATH Files" and in litigation records.

88.    Defendants' reliance on the WPATH "affirmation" model — and their treatment of Plaintiffs' evidence-based refusal to follow that model as "abuse" — was therefore reliance on a standard Defendants knew or should have known to be scientifically unsound.

N.    **"Gender-affirming care" as involuntary medical experimentation.**

89.    Because these interventions are experimental — unproven as to efficacy and known to cause serious, often irreversible harm — subjecting a child to them, or setting a child on the pathway toward them without genuine, informed, and protective parental consent, is a form of involuntary human medical experimentation. "Gender-affirming care" is the latest example of that phenomenon.

90.    By seizing K.A. from the one parent who was protecting her from this pathway, placing her in an "affirming" environment, and adopting "affirmation" as the condition of reunification, Defendants set a vulnerable, self-harming minor on a trajectory toward these experimental and harmful interventions.

91.    Defendants knew, or reasonably should have known, that puberty blockers and cross-sex hormones have never been proven safe or effective for gender dysphoria and that they cause serious harm. In taking custody of K.A., Defendants entered a special relationship with

her, triggering an affirmative duty to protect her from foreseeable and preventable harms, including exposure to these dangerous interventions. Sterility and the other injuries alleged are foreseeable and preventable harms.

92.    No good parent, aware of these facts, would "affirm" a child's false belief that she is the opposite sex, or consent to the child's subjection to the disabling consequences of "gender-affirming care." Plaintiffs' refusal was not abuse; it was the discharge of their most basic duty to protect the child they were raising.

## V.    CLAIMS FOR RELIEF

### CLAIM FOR RELIEF NO. 1

### (42 U.S.C. § 1983)

**Violation of Substantive Due Process — Familial Association and the Right to Direct the Care, Custody, and Upbringing of One's Child**

(Nicole Calaway v. Jennifer Forster, LPC; Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

93.    Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

94.    The interest of a parent in the care, custody, companionship, and management of her child is a fundamental liberty interest protected by the Due Process Clause of the Fourteenth Amendment. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000). The right to familial association is likewise protected by the First and Fourteenth Amendments. *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000); *Rogers v. County of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007); *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018).

95.    This right was clearly established such that any reasonable child-welfare official in Defendants' position would have known that the State may not remove a child from a fit parent, or maintain that removal, absent reasonable cause to believe the child is in imminent

danger of serious harm and that removal is narrowly tailored to that danger — and may never do so as a penalty for the parent's protected religious or expressive viewpoint.

96.    There was no reasonable cause to believe K.A. was in imminent danger of serious harm at Nicole's hands. K.A.'s difficulties predated the conduct labeled "abuse"; a neutral court had twice denied immediate-danger motions on the same facts; ODHS had already found the mental-injury allegation unfounded; the neutral PCP saw no abuse and an improving dynamic; and K.A.'s suicidal ideation had reduced on medication Nicole and David supported.

97.    Defendants nonetheless removed K.A., and have maintained an extraordinary severance of the parent–child relationship, based not on any narrowly tailored safety rationale but on Nicole's viewpoint. In doing so, Defendants violated Nicole's clearly established rights.

98.    As a direct and proximate result, Nicole has suffered the loss of her daughter's society and companionship, severe emotional distress, and economic loss, in amounts to be proven at trial. Defendants acted intentionally and with deliberate or reckless disregard for Nicole's constitutional rights, entitling her to punitive damages against the individual Defendants.

## CLAIM FOR RELIEF NO. 2

### (42 U.S.C. § 1983)

**Judicial Deception — Material Misrepresentations and Omissions in Procuring the Protective Custody Order and the "Founded" Finding**

(Nicole Calaway v. Jennifer Forster, LPC; Rachel Woods; Tyler Wampler; McKenna Hoole; Lena Bolling; and Does 1–20)

99.    Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

100.    It is clearly established in this Circuit that a state official who deliberately or recklessly makes material misrepresentations, or omits material exculpatory facts, in order to obtain judicial authorization affecting the parent–child relationship violates the Constitution. *Benavidez v. County of San Diego*, 993 F.3d 1134 (9th Cir. 2021); *Hardwick v. County of*

*Orange*, 844 F.3d 1112 (9th Cir. 2017); *Costanich v. Department of Social & Health Services*, 627 F.3d 1101 (9th Cir. 2010); *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001).

101.    As alleged above, in procuring the Protective Custody Order and in the Protective Custody Report and subsequent proceedings, Defendants deliberately or recklessly presented a one-sided narrative and omitted material exculpatory facts — including the prior UNFOUNDED disposition, the two DENIED immediate-danger motions, the neutral PCP's observations, the reduction in K.A.'s suicidal ideation on supported medication, K.A.'s recantation, and that the agency's own record attributed the specific verbal conduct inconsistently, leaving the "founded" findings resting on a confused and internally contradictory basis.

102.    Moreover, Forster's statement that Nicole was "angry" and "aggressive" was false. Forster's statement that Nicole had a "desire to manage [K.A.'s] mental health without counseling support" was false, as Nicole did not say, suggest or imply that. These false statements were to intended to deceive the Court.

103.    These misrepresentations and omissions were material: had the truth been disclosed, no reasonable judicial officer would have found the imminent-danger showing necessary to remove K.A. from Nicole, and the "founded" finding against Nicole could not have been sustained.

104.    As a direct and proximate result, Nicole suffered the injuries alleged above. Defendants acted knowingly, maliciously, or with reckless disregard for the truth, entitling Nicole to punitive damages.

## CLAIM FOR RELIEF NO. 3
### (42 U.S.C. § 1983)
### Violation of the First Amendment — Free Exercise of Religion
(Nicole Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

105.    Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

106. The Free Exercise Clause of the First Amendment, applicable to the States through the Fourteenth Amendment, protects Nicole's sincerely held religious beliefs and her religiously motivated direction of her child's upbringing. *Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993).

107. Defendants' removal of K.A. and their "founded" finding were neither neutral nor generally applicable. They were directed at, and penalized, Nicole's religiously motivated conduct — her Christian belief that a person cannot change sex, her refusal to "affirm" transition, her selection of a Christian school, and her religiously grounded objection to "gender ideology." The agency record repeatedly foregrounds the parents' religious viewpoint as the mechanism of the claimed harm.

108. The agency stated the basis of its finding against Nicole in its own words—that Nicole's "adverse reactions to [K.A.] expressing [her] gender identity have caused serious harm to [K.A.'s] psychological functioning." A finding framed in those terms is neither neutral nor generally applicable; it penalizes the content of Nicole's religiously and conscientiously motivated response to the gender-identity question, and it triggers the strict scrutiny that Defendants cannot satisfy.

109. Because Defendants targeted religiously motivated conduct and treated it as "abuse," their action is subject to strict scrutiny, which it cannot survive: Defendants had no compelling interest in penalizing Nicole's faith, and their action was not narrowly tailored to any legitimate child-safety concern. The Ninth Circuit recently confirmed that Oregon's child-welfare authorities may not exclude a person from caring for a child because of her religiously grounded refusal to affirm the State's views on gender identity. *Bates v. Pakseresht*, No. 23-4169 (9th Cir. 2025).

110. As a direct and proximate result, Nicole suffered the injuries alleged above and is entitled to compensatory and punitive damages and to declaratory and injunctive relief.

# CLAIM FOR RELIEF NO. 4

## (42 U.S.C. § 1983)

### Violation of the First Amendment — Free Speech and Compelled Speech

(Nicole Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

111.    Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

112.    The First Amendment protects both the right to speak and the right not to be compelled to speak or to affirm beliefs one does not hold. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977); *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).

113.    Defendants penalized Nicole's protected speech — including her showing K.A. the Cass Review, school-board footage, and a detransitioner's account, and her declining to use a chosen name and pronouns — by treating that speech as the mechanism of "mental injury" and a basis for removal and a founded finding.

114.    The founded dispositions confirm that Defendants treated the content of Plaintiffs' expression as the very "abuse" they punished. The agency's written bases fault David for having "provided hours long lectures" and fault Nicole for her "adverse reactions to [K.A.] expressing [her] gender identity"—that is, for the ideas Plaintiffs communicated to their own child on a contested matter of public concern. Penalizing a parent for the content and viewpoint of her speech, and then conditioning reunification on her willingness to voice the opposite view, is a paradigmatic violation of the First Amendment.

115.    Defendants further sought to compel Nicole's speech by conditioning the return of her daughter on Nicole's willingness to "affirm" K.A. as "transgender" and to endorse "gender ideology" — in effect requiring Nicole to profess, as the price of reunification, beliefs that contradict reality and that her religion forbids. In *Bates v. Pakseresht*, No. 23-4169 (9th Cir. 2025), the Ninth Circuit held that Oregon may not condition eligibility to care for a child on a person's willingness to affirm the State's beliefs about gender identity; conditioning reunification on such affirmation is materially indistinguishable and equally unconstitutional.

116. Penalizing protected speech and compelling ideological affirmation in this manner violated Nicole's clearly established First Amendment rights. As a direct and proximate result, Nicole suffered the injuries alleged above and is entitled to compensatory and punitive damages and to declaratory and injunctive relief.

## CLAIM FOR RELIEF NO. 5

### (42 U.S.C. § 1983)

**Violation of the First Amendment — Retaliation and Prior Restraint: ODHS's Extrajudicial Directive Barring Plaintiffs' Access to K.A.'s Educational Records**

(Nicole Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

117. Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

118. The First Amendment protects not only the right to speak but the right to receive information and ideas, and it forbids the government from imposing a prior restraint on protected expression or retaliating against a person for engaging in protected activity. *Stanley v. Georgia*, 394 U.S. 557 (1969); *Board of Education v. Pico*, 457 U.S. 853 (1982); *Lamont v. Postmaster General*, 381 U.S. 301 (1965); *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976); *Nieves v. Bartlett*, 587 U.S. 391 (2019).

119. Nicole sought her daughter's educational records through the ParentVue portal maintained by K.A.'s school. Acting without any court order, ODHS caused Mountainside High School to deny Nicole access to those records "in order to comply with Oregon DHS instructions." That directive was a content-based restraint on Nicole's receipt of lawfully available information about her own child.

120. To bar a fit parent from receiving and reviewing her own child's educational records is to impose a content-based prior restraint on the receipt of information, one bearing a heavy presumption of unconstitutionality that Defendants cannot overcome. *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976).

121.  ODHS's directive rested on no court order and served no legitimate, let alone compelling, governmental interest. It was directed at, and retaliated against, Nicole's protected effort to inform herself about her own child's education. *Nieves v. Bartlett*, 587 U.S. 391 (2019).

122.  As a direct and proximate result, Nicole was deprived of her First Amendment right to receive lawfully available information about her own child, and suffered the injuries alleged above. Defendants acted intentionally and with deliberate or reckless disregard for her constitutional rights, entitling her to compensatory and punitive damages and to declaratory and injunctive relief.

## CLAIM FOR RELIEF NO. 6

### (42 U.S.C. § 1983)

**Violation of Substantive Due Process — Denial of a Fit Parent's Right of Access to Her Child's Educational Records**

(Nicole Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

123.  Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

124.  A parent's right to direct the care, custody, and upbringing of her child — protected by the Due Process Clause of the Fourteenth Amendment — encompasses the right of a fit parent to access her minor child's educational records so that she may participate in and make informed decisions about the child's education. *Troxel v. Granville*, 530 U.S. 57 (2000); *Parham v. J.R.*, 442 U.S. 584 (1979). Congress has separately recognized a parent's right to inspect and review her child's education records. See 20 U.S.C. § 1232g(a)(1)(A).

125.  Defendants directed K.A.'s school that Nicole was not to receive or view K.A.'s educational records — including, by the written admission of the Mountainside High School counselor, blocking Nicole's access to the ParentVue educational portal "in order to comply with Oregon DHS instructions."

126. Defendants' denial of a fit parent's access to her child's educational records was not narrowly tailored to any legitimate child-safety interest and was undertaken, at least in part, to penalize Nicole's protected viewpoint. It deprived Nicole of her fundamental parental right without adequate justification or process.

127. As a direct and proximate result, Nicole suffered the injuries alleged above and is entitled to compensatory and punitive damages and to declaratory and injunctive relief, including an order restoring her access to K.A.'s educational records as permitted by law.

## CLAIM FOR RELIEF NO. 7

### (42 U.S.C. § 1983)

### Violation of the Fourteenth Amendment — Equal Protection / Viewpoint Discrimination

(Nicole Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

128. Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

129. The Equal Protection Clause forbids the State from treating similarly situated persons differently on the basis of their protected viewpoint or the exercise of their fundamental rights.

130. On information and belief, Defendants treat "affirming" and "non-affirming" parents differently: they subject a non-affirming parent's exercise of religion and parental judgment to child-abuse scrutiny, removal, and a founded finding, while an affirming parent's identical exercise of authority — including consent to social transition or medical intervention — receives no such scrutiny. Defendants applied this differential treatment to Nicole because of her viewpoint.

131. The agency's own founded-disposition letters lay this viewpoint discrimination bare, faulting Plaintiffs for declining "to support Kaitlyn's gender identity" and for their "adverse reactions to [K.A.] expressing [her] gender identity." An "affirming" parent who took the opposite view of the identical child would have been subject to no such scrutiny, removal, or

founded finding. The differential treatment turns entirely on Plaintiffs' protected viewpoint. See *Bates v. Pakseresht*, No. 23-4169 (9th Cir. 2025).

132.    This viewpoint-based, rights-burdening classification cannot survive the applicable heightened scrutiny and lacks even a rational basis as applied to Nicole. As a direct and proximate result, Nicole suffered the injuries alleged above and is entitled to compensatory and punitive damages and to declaratory and injunctive relief.

## CLAIM FOR RELIEF NO. 8

### (42 U.S.C. § 1983)

### Violation of Procedural Due Process — The "Founded" Mental-Injury Designation and the Child-Abuse Registry

(Nicole Calaway v. Jennifer Forster, LPC; Rachel Woods; Tyler Wampler; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

133.    Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

134.    A state's placement of a person on a child-abuse registry, coupled with the tangible legal consequences that flow from a "founded" disposition, implicates a constitutionally protected liberty interest under the "stigma-plus" doctrine and requires constitutionally adequate procedures. *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), rev'd in part on other grounds, 562 U.S. 29 (2010).

135.    Defendants branded Nicole a perpetrator of child "Mental Injury" and recorded that determination, with attendant consequences for her reputation and for any activity requiring a child-abuse records check, without affording her a timely, meaningful opportunity before a neutral decision-maker to confront the evidence and be heard — a process rendered still less adequate because the underlying determination rested on the one-sided, materially incomplete record alleged above, and was then "upheld" on a review that repeated rather than cured those defects.

136.  As a direct and proximate result, Nicole suffered reputational, emotional, and economic injury, and is entitled to damages and to injunctive relief expunging the founded finding.

## CLAIM FOR RELIEF NO. 9

### (42 U.S.C. § 1983)

**State-Created Danger and Unwarranted Medical Direction — Exposure of the Child to Harmful, Experimental "Gender-Affirming Care"**

(Nicole Calaway v. Jennifer Forster, LPC; Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

137.  Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

138.  A parent has a constitutionally protected right to make medical decisions for her child and to be free of non-consensual, unwarranted medical intervention imposed on the child by the State. *Parham v. J.R.*, 442 U.S. 584 (1979); *Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000).

139.  By removing K.A. from the one parent protecting her from the "gender-affirming" pathway, placing her in an affirming environment, and conditioning reunification on Nicole's affirmation, Defendants affirmatively created or materially increased the danger that a vulnerable, self-harming minor would be placed on puberty blockers and cross-sex hormones — interventions that are experimental, unproven, and known to cause serious and irreversible harm, including sterility.

140.  Defendants knew, or reasonably should have known, in light of the Cass Review, the 2025 HHS Review, the policy reversals in Sweden, Finland, and England, and the discredited character of the WPATH "Standards of Care," that these interventions are neither safe nor effective and are harmful. Having taken K.A. into custody, Defendants owed her an affirmative duty to protect her from these foreseeable and preventable harms, which they disregarded with deliberate indifference.

141.   As a direct and proximate result, Nicole has suffered the loss of her protected role in her daughter's medical care and the injuries alleged above, and is entitled to compensatory and punitive damages and to declaratory and injunctive relief.

## CLAIM FOR RELIEF NO. 10

### (State Law)

### Intentional Infliction of Emotional Distress

(Nicole Calaway v. Jennifer Forster, LPC)

142.   Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

143.   Defendants' conduct — seizing a fit mother's child as a penalty for her faith and viewpoint, branding her a child abuser on a false and one-sided record, and severing virtually all contact between mother and daughter — was extreme and outrageous, beyond all bounds of decency tolerated in a civilized community.

144.   Defendants intended to cause, or acted with reckless disregard of the high probability of causing, Nicole severe emotional distress, and their conduct in fact caused Nicole severe and ongoing emotional distress.

145.   As a direct and proximate result, Nicole is entitled to compensatory and punitive damages according to proof.

## CLAIM FOR RELIEF NO. 11

### (42 U.S.C. § 1983)

### Violation of Procedural Due Process — David's "Founded" Mental-Injury and "Threat of Harm" Designations and the Child-Abuse Registry (Stigma-Plus)

(David Calaway v. Jennifer Forster, LPC; Rachel Woods; Tyler Wampler; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

146.   David Calaway incorporates each preceding paragraph as though fully set forth herein.

147. The State's designation of a person as a perpetrator of child abuse — recorded by the agency and disclosable through child-abuse records checks — combined with the tangible legal consequences that flow from a "founded" disposition, deprives that person of a constitutionally protected liberty interest and triggers the protections of the Due Process Clause of the Fourteenth Amendment. *Humphries v. County of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), rev'd in part on other grounds, 562 U.S. 29 (2010).

148. Defendants branded David a perpetrator of child "Mental Injury" and recorded that determination, injuring his reputation and altering his legal status. That "stigma-plus" — reputational harm coupled with a tangible change in legal status — entitles David to constitutionally adequate process before the designation attaches and is maintained.

149. Defendants' stigmatization of David did not stop with the Mental-Injury finding. As alleged above, more than a year after ODHS dismissed its own dependency petition and after Plaintiffs had relocated to Florida, ODHS issued a second "Founded" disposition against David—a December 22, 2025 "Threat of Harm" finding, affirmed on June 5, 2026—branding him, without any charge, conviction, adjudication, or competent evidentiary support, as a person with "a history of grooming and sexually abusing a minor."

150. That escalated designation compounded the reputational and legal injury to David and was likewise imposed through a one-sided, non-adversarial agency process that afforded him no meaningful, neutral opportunity to confront and rebut the accusation before an impartial decision-maker.

151. The process afforded David was constitutionally inadequate. The "founded" designation attached and was maintained through a one-sided, non-adversarial agency review that gave him no meaningful, neutral opportunity to confront and rebut the allegations before an impartial decision-maker.

152. As a direct and proximate result, David has suffered reputational, emotional, and economic injury, and is entitled to damages and to injunctive relief expunging the "founded" finding and removing his name from any child-abuse registry.

## CLAIM FOR RELIEF NO. 12

### (42 U.S.C. § 1983)

### Violation of the First Amendment — Free Exercise of Religion

(David Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

153. David Calaway incorporates each preceding paragraph as though fully set forth herein.

154. David is a conservative Christian who shares Nicole's sincerely held religious convictions concerning the created order and the immutability of sex. The Free Exercise Clause of the First Amendment, applicable to the States through the Fourteenth Amendment, protects his religiously motivated conduct.

155. Defendants' "founded" Mental-Injury designation against David was neither neutral nor generally applicable. It targeted and penalized his religiously motivated refusal to "affirm" K.A. as "transgender," treating the exercise of his faith as "abuse."

156. Because Defendants targeted religiously motivated conduct, their action is subject to strict scrutiny, which it cannot survive: Defendants had no compelling interest, and no narrowly tailored means, for branding David a child abuser on account of his faith. See *Bates v. Pakseresht*, No. 23-4169 (9th Cir. 2025). As a direct and proximate result, David suffered the injuries alleged above and is entitled to compensatory and punitive damages and to declaratory and injunctive relief.

## CLAIM FOR RELIEF NO. 13

### (42 U.S.C. § 1983)

### Violation of the First Amendment — Free Speech and Compelled Speech

(David Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

157. David Calaway incorporates each preceding paragraph as though fully set forth herein.

158.    The First Amendment protects both the right to speak and the right not to be compelled to speak or to affirm beliefs one does not hold. *West Virginia State Board of Education v. Barnette,* 319 U.S. 624 (1943).

159.    Defendants penalized David's protected expression and sought to compel his speech — conditioning resolution of the "founded" finding against him, and the family's reunification, on his willingness to "affirm" K.A.'s asserted identity and to endorse a belief he does not hold. *Bates v. Pakseresht,* No. 23-4169 (9th Cir. 2025), confirms that Oregon may not so condition a person's standing to care for a child on ideological affirmation.

160.    Penalizing protected expression and compelling ideological affirmation in this manner violated David's clearly established First Amendment rights. As a direct and proximate result, David suffered the injuries alleged above and is entitled to compensatory and punitive damages and to declaratory and injunctive relief.

### CLAIM FOR RELIEF NO. 14

### (42 U.S.C. § 1983)

**Violation of the First Amendment — Retaliation and Prior Restraint: ODHS's Extrajudicial Directive Barring Plaintiffs' Access to K.A.'s Educational Records**

(David Calaway v. Rachel Woods; McKenna Hoole; Lena Bolling; Does 1–20; and, for prospective relief, the Director of ODHS in her official capacity)

161.    David Calaway incorporates each preceding paragraph as though fully set forth herein.

162.    The First Amendment protects the right to receive information and ideas and forbids the government from imposing a prior restraint on protected expression or retaliating against a person for protected activity. *Stanley v. Georgia,* 394 U.S. 557 (1969); *Lamont v. Postmaster General,* 381 U.S. 301 (1965); *Nieves v. Bartlett,* 587 U.S. 391 (2019).

163.    David, together with Nicole, was subject to ODHS's extrajudicial blocking of the family's access to K.A.'s educational records, imposed without any court order — a content-based restraint on David's receipt of lawfully available information about the child he was helping to raise.

164.    Barring David from receiving and reviewing K.A.'s educational records punished protected First Amendment activity and imposed a content-based prior restraint that bears a heavy presumption of unconstitutionality. *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976).

165.    As a direct and proximate result, David was deprived of his First Amendment right to receive lawfully available information about the child he was helping to raise and suffered the injuries alleged above. Defendants acted intentionally and with deliberate or reckless disregard for his constitutional rights, entitling him to compensatory and punitive damages and to declaratory and injunctive relief.

## CLAIM FOR RELIEF NO. 15

### (42 U.S.C. § 1983)

**Conspiracy and Joint Action to Fabricate the Basis for K.A.'s Removal**

(Nicole Calaway and David Calaway v. Jennifer Forster, LPC and Rachel Woods)

166.    Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

167.    A private individual acts under color of state law, and is subject to liability under 42 U.S.C. § 1983, when she is a willful participant in joint action with the State or its agents, or conspires with state actors to bring about a deprivation of federal rights. *Dennis v. Sparks*, 449 U.S. 24 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Tower v. Glover*, 467 U.S. 914 (1984); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Franklin v. Fox*, 312 F.3d 423 (9th Cir. 2002); *Collins v. Womancare*, 878 F.2d 1145 (9th Cir. 1989). The joint-action test is satisfied where the State has so far insinuated itself into a position of interdependence with a private actor, or where the private actor and state officials share in a deliberate, prearranged plan, that the private conduct is fairly attributable to the State.

168.    Defendant Forster was a willful participant in joint action with ODHS. She did not merely furnish information to the authorities; she acted at the express direction and encouragement of Defendant Woods, a state child-welfare caseworker, and in furtherance of ODHS's pre-existing objective to remove K.A. Woods told Forster that ODHS had already "found grounds for mom and step-dad's mental abuse of client," and Woods "recommended

that [Forster] call the CPS hotline." Forster did so. This coordination reflects a meeting of the minds and a prearranged plan between a private actor and state officials sufficient to render Forster a state actor and a co-conspirator.

169. In carrying out that plan, Forster made statements to ODHS and to the State's child-abuse hotline that were false and that she knew, or recklessly disregarded as, false — including that Nicole had "presented as aggressive and angry," that K.A. "would no longer have support" and had "no outside support," and that Nicole had terminated counseling out of a "desire to manage client's mental health without counseling support." Forster's own consensually recorded session refutes each statement: Nicole was calm and civil; Forster herself acknowledged Nicole's right to the records; K.A. remained under the care of her primary-care physician and on prescribed medication; and both K.A. and Nicole made clear they wished only to discontinue this particular counselor, not to forgo mental-health care.

170. The object and effect of the conspiracy were accomplished. Forster's false report furnished a fabricated appearance of urgency — a vulnerable child abruptly stripped of all "support" by an "aggressive and angry" mother — that the state Defendants used to justify seizing K.A. on July 18, 2024, and to support the "founded" dispositions against Plaintiffs. But for the fabricated premise, there was no reasonable basis to believe K.A. faced imminent danger of serious harm in Nicole's care.

171. As a direct and proximate result, Plaintiffs suffered the injuries alleged above. Defendant Forster and her co-conspirators acted intentionally, maliciously, or with reckless disregard for Plaintiffs' constitutional rights, entitling Plaintiffs to compensatory and punitive damages.

**CLAIM FOR RELIEF NO. 16**

**(State Law — Supplemental Jurisdiction, 28 U.S.C. § 1367)**

**Therapeutic Malpractice (Professional Negligence)**

(Nicole Calaway v. Jennifer Forster, LPC)

172. Nicole Calaway incorporates each preceding paragraph as though fully set forth herein.

173.   Defendant Forster, as a licensed professional counselor, undertook to provide mental-health treatment to K.A., a minor, and to communicate with K.A.'s family concerning that care. That undertaking subjected Forster to the standard of care of a reasonably prudent, careful, and skillful member of her profession, and the scope of her duty is measured by the scope of her professional undertaking. Under Oregon law, a professional's duty of care may extend to a closely related non-patient where the elements of a special relationship are present. See *Tomlinson v. Metropolitan Pediatrics, LLC*, 362 Or 431, 412 P.3d 133 (2018); *Conway v. Pacific University*, 324 Or 231, 240 (1996). Here, Forster's duty of reasonable professional care extended not only to K.A. but also to Nicole, K.A.'s biological mother, who at all relevant times had legal custody of K.A. and was her primary residential caregiver, who engaged Forster to counsel her daughter, and who participated in and communicated with Forster about that care.

174.   Nicole reasonably relied on Forster to exercise reasonable professional skill, judgment, and honesty in K.A.'s treatment and in any communications Forster made concerning K.A. and her family. Nicole was a specifically identifiable person — the custodial parent with whom Forster was already communicating about K.A.'s care — and not a member of an indeterminate class. Her interests in the care and custody of her daughter, in the integrity of the mother–daughter relationship, and in freedom from a baseless child-welfare intervention were legally protected interests that a reasonably careful counselor in Forster's position necessarily had in contemplation.

175.   Recognizing this duty to Nicole created no conflict with, and did not divide Forster's loyalty to, her minor patient. No part of the professional standard of care owed to a minor includes making false, reckless, or unsupported statements to a child-protective agency, or precipitating the removal of the child from a fit custodial parent on fabricated grounds. To the contrary, Forster's competent, truthful, and reasonably careful performance of her professional duties to K.A. would at the same time have protected Nicole from the harm alleged below. The interests of patient and mother were aligned, not adverse.

176. Forster breached that duty. She made false representations concerning Nicole and K.A.'s circumstances — that Nicole was "aggressive and angry," that K.A. "would no longer have support," and that Nicole sought to "manage [K.A.'s] mental health without counseling support" — to ODHS and to the State's child-abuse hotline, when a reasonable counselor exercising ordinary care would have known those statements to be false. She further breached the standard of care in that she knew, or in the exercise of reasonable professional care should have known, that so-called "gender-affirming care," including social transition, is not a proven, safe, or effective treatment for an adolescent girl and is psychologically harmful, yet she acted in a manner that helped place K.A. on that pathway rather than protecting her from it.

177. It was reasonably foreseeable to a licensed counselor in Forster's position that false or unsupported statements to a child-protective agency, and conduct precipitating the removal of a child from her mother under false pretenses, would cause serious injury to the child's mother — including the loss of her child's society and custody, severe emotional distress, and economic loss. Such harm to Nicole was not a remote or incidental consequence of Forster's breach but a direct and predictable result of it, falling squarely within the scope of the risks that the professional standard of care exists to guard against.

178. Forster's breaches were a direct and proximate cause of K.A.'s wrongful removal from Nicole's care, the "founded" child-abuse findings against Nicole, and the severance of the mother–daughter relationship. But for Forster's false representations, there was no reasonable basis to remove K.A. from Nicole.

179. As a direct and proximate result, Nicole has suffered the loss of her daughter's society and companionship, severe emotional distress, reputational injury, and economic loss, in amounts to be proven at trial. The applicable standard of care and Forster's breach of it will be established by expert testimony.

## CLAIM FOR RELIEF NO. 17

## (28 U.S.C. § 2201)

### Declaratory Relief

### (Plaintiffs v. All Defendants)

180. Plaintiffs incorporate each preceding paragraph as though fully set forth herein.

181. An actual, present controversy exists between Plaintiffs and Defendants regarding the constitutionality of Defendants' conduct and policies. Plaintiffs seek a declaration that: (a) a parent's religiously and medically grounded refusal to "affirm" a child's claimed "transgender" identity does not constitute child abuse or "mental injury"; (b) the State may not remove a child from, or maintain a founded finding against, a fit parent on the basis of the parent's protected religious or expressive viewpoint; (c) the State may not condition reunification on a parent's affirmation of beliefs they do not hold; and (d) the "founded" findings against Plaintiffs are unconstitutional and must be expunged.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Nicole A. Calaway and David J.W. Calaway state that no amount of money could possibly compensate them for the horrific harm visited upon them, but money damages, declaratory and injunctive relief being that which is available, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

a.    For compensatory and general damages according to proof, but not less than $5,000,000;

b.    For special and economic damages according to proof;

c.    Against the individual Defendants, for punitive damages as allowed by law;

d.    For a declaratory judgment as set forth in Claim 17;

e.    For injunctive relief, including an order expunging the "founded" Mental-Injury findings against Plaintiffs and removing Plaintiffs from any child-abuse registry, prohibiting Defendants from entering David Calaway's name into any sex-offender

registry, and restoring Nicole Calaway's access to K.A.'s educational records, as permitted by law;

f.    For reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable statute; and

g.    For such other and further relief as the Court deems just and proper.

## VII.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 15th day of July, 2026.

_Nicole A. Calaway_

Nicole A. Calaway, Plaintiff

_David J.W. Calaway_

David J.W. Calaway, Plaintiff

**VERIFICATION**

I, Nicole Calaway, am a Plaintiff in this action. I have reviewed the factual allegations of the foregoing Complaint. The facts stated therein are within my personal knowledge and are true and correct, except as to those matters alleged on information and belief, which I believe to be true. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2026, at Pensacola, Florida.

Nicole A. Calaway, Plaintiff

I, David Calaway, am a Plaintiff in this action. I have reviewed the factual allegations of the foregoing Complaint. The facts stated therein are within my personal knowledge and are true and correct, except as to those matters alleged on information and belief, which I believe to be true. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2026, at Pensacola, Florida.

David J.W. Calaway, Plaintiff

COMPLAINT